# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2015

## PATRICK RICO EDWARDS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2007-A-176      Monte Watkins, Judge**

_____

### No. M2014-01839-CCA-R3-PC – March 23, 2016
_____

Patrick Rico Edwards ("the Petitioner") appeals from the denial of his petition for post-conviction relief.  On appeal, the Petitioner argues (1) that his trial counsel was ineffective for failing to present at the sentencing hearing expert testimony about the Petitioner's mental health; and (2) that his plea was unknowing and involuntary.  Additionally, the Petitioner contends that the post-conviction court's failure to make findings of fact and conclusions of law about the voluntariness of his plea constitutes reversible error.  We conclude that the post-conviction court erred when it failed to make findings of fact and conclusions of law regarding the voluntary and intelligent nature of the Petitioner's plea but such error was harmless in this case.  Further, we conclude that the Petitioner has failed to prove that he is entitled to post-conviction relief for either of his claims.  The judgment of the post-conviction court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Richard Strong (on appeal) and Isaac Conner (at hearing), Nashville, Tennessee, for the appellant, Patrick Rico Edwards.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Deborah Housel, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural Background

*Guilty Plea and Sentencing*

The Petitioner was indicted with first degree premeditated murder and first degree felony murder.[1] The Petitioner's August 2008 trial ended in a mistrial. The Petitioner ultimately pleaded guilty to the lesser-included offense of second degree murder. The plea agreement, included in the record on this appeal, shows that the Petitioner entered an open guilty plea to second degree murder, with the range of punishment being between fifteen and twenty-five years.

At the plea hearing, the trial court conducted a plea colloquy with the Petitioner, and the Petitioner confirmed that he understood that, by pleading guilty, he was giving up his right to a jury trial. The Petitioner also denied being forced or threatened into pleading guilty. The Petitioner confirmed that he reviewed the plea agreement with trial counsel and that he did not have any questions about the plea agreement. He also stated that he freely and voluntarily signed the plea agreement.

The State offered the following factual basis for the plea:

As Your Honor recalls from the case that was tried in August, on October 6th, 2006, Jessica Toombs, Joey York, Brandon Morrison, and Keith Casselberry, and Christopher Hudson went to Nashboro Village to buy ecstasy from [the Petitioner] and Ryan Scott Lewis. When they arrived at the scene Christopher Hudson went over to the car that was driven by the [defendant]. As you heard from witnesses that were on the scene, Judge— like Ms. Laquita Weaver and, also, Eric Richey—Mr. Hudson leaned into the car and saw [Petitioner's] gun, became frightened and started running back behind the car. [Petitioner] got the gun and shot Christopher Hudson in the back as he was running. Mr. Hudson tried to crawl to the sidewalk, and as Your Honor remembers, if you'll recall the testimony, [Petitioner] got out of the car and went over to where Mr. Hudson was lying. Had this case proceeded to trial the State would have called [Petitioner's] co-defendant, Ryan Scott Lewis, who would have testified that they intended to rob Christopher Hudson, that [Petitioner] did take over a hundred dollars from the body of Christopher Hudson, that they then went back to the

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal. See Tenn. R. App. P. 13(c); State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009); State ex rel Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964).

apartment and when they got back to the apartment they divided the proceedings [sic]. Your Honor, also, recalls that the police were taken to the apartment where Ryan Scott Lewis and [Petitioner] were, and that, then, they were taken by a man by the name of Corey Ashley to David Barnett's home where they retrieved the murder weapon. And as you, also, will recall, Judge, TBI Agent Don Carman testified in August that there was a match between the murder weapon and the bullet and casing that were found at the scene.

At a subsequent sentencing hearing, the Petitioner's mother, Pamela Rooks, testified that the Petitioner attempted to commit suicide by overdosing on pills about a year before he was arrested in the instant case. Ms. Rooks reported that the Petitioner spent "[a]bout a week" in the hospital. Trial counsel also introduced the medical records from the time the Petitioner spent in the hospital after his attempted suicide. Following his discharge from the hospital, the Petitioner did not receive any mental health treatment. The trial court sentenced the Petitioner to twenty-one years' incarceration.

On direct appeal, this court affirmed the Petitioner's conviction and sentence. State v. Patrick Rico Edwards, No. M2009-01277-CCA-R3-CD, 2011 WL 497444, at *4 (Tenn. Crim. App. Feb. 11, 2011), perm. app. denied (Tenn. May 26, 2011).

*Post-Conviction Proceedings*

The Petitioner filed a pro se "Petition for Relief from Conviction or Sentence" alleging, among other things, that he entered an involuntary and unknowing guilty plea and that he received ineffective assistance of counsel. Post-conviction counsel was appointed and filed another "Petition for Post-Conviction Relief" (collectively, "the Petition"), alleging ineffective assistance of counsel and that the trial court improperly weighed a mitigating factor at the sentencing hearing.

At the post-conviction hearing, the Petitioner testified that he was twenty-seven years old at the time of the hearing and that "the last grade [he] made it to" was the ninth grade. He said he did not take a plea agreement before his first trial because he felt that he had a better chance at trial than the plea he was offered. The first trial ended in a mistrial. The Petitioner stated that, prior to the second trial, he was offered another plea agreement. The Petitioner said trial counsel advised him to take the plea because his co-defendant was "going to give a statement." The Petitioner stated that he wanted to go to trial the second time, but he decided not to after talking to his mother and trial counsel. The Petitioner noted that his mother was "the dominant factor" in his decision to plead guilty. The Petitioner recalled that his second plea offer involved a sentence of approximately "fifteen years." He ultimately received a twenty-one year sentence.

The Petitioner recalled that he discussed with trial counsel the mitigating factors that trial counsel intended to present at the sentencing hearing, but he did not understand what mitigating and enhancement factors were. The Petitioner said he told trial counsel that he did not understand, but that trial counsel was still not able to explain it in a way that he could comprehend. The Petitioner did not know what trial counsel's strategy was for the sentencing hearing, and he could not recall whether he was informed of any strategy before the hearing. The Petitioner remembered that his mother testified on his behalf and that several letters were written on his behalf. The Petitioner reported that he had been feeling depressed prior to the sentencing hearing but that he had not been diagnosed with depression.

The Petitioner also stated that, about a year prior to the commission of this offense, he had tried to commit suicide by taking "a bunch of pills." He stated that he felt like "nobody cared at that time" and that he had felt that way for "a few years." He had contemplated committing suicide before, but this was the first time he had attempted suicide. The Petitioner said that he did not feel any better after his suicide attempt and that he still felt the same way he did at that time. He did not see a psychologist or psychiatrist after his suicide attempt. The Petitioner said he told trial counsel about the suicide attempt, but the Petitioner did not recall any "significant conversations" about it. The Petitioner was not examined by a psychologist or psychiatrist prior to the sentencing hearing, and he initially did not remember the suicide attempt being addressed at the sentencing hearing. When questioned further, the Petitioner remembered that his mother testified at the sentencing hearing about his attempted suicide, but he did not remember trial counsel introducing medical records about his suicide attempt.

On cross-examination, the Petitioner confirmed that trial counsel met with him many times, that she provided the Petitioner with discovery, that she discussed the strength of the State's case with the Petitioner, and that she discussed trial strategy with the Petitioner. The Petitioner also confirmed that he confessed to the police. The Petitioner said he was present at the first trial and that he understood everything the witnesses said in their testimony. The Petitioner understood that he could be given a fifty-one year sentence if he was convicted at trial. The Petitioner also admitted that he knew he could receive a sentence anywhere between fifteen to twenty-five years for his guilty plea. The following exchange also occurred between the Petitioner and the State:

Q: [Trial counsel] didn't make you plead guilty; did she? That was your decision; wasn't it?

A: Yes.

Q: And you, also, talked to your mother about your decision; right?

A: Yes.

Q: Your mother didn't make you plead guilty either; did she?

A: Nope.

The Petitioner acknowledged that the trial court informed him of his rights during the plea colloquy, including his right to go to trial, but the Petitioner said he did not understand those rights at the time. Nevertheless, the Petitioner confirmed that he understood he was pleading guilty and that he decided to plead guilty on his own. On redirect examination, the Petitioner stated that, before the second trial, he felt that trial counsel "was trying to get [the Petitioner] to take that plea, rather than go back to trial."

Ms. Rooks testified that she had a good relationship with her son. She said she was not aware, prior to the Petitioner's suicide attempt, that he was feeling depressed because she worked and was attending school and she did not have much time to spend with him during the week. Ms. Rooks also said she was "hard on" her children, which may have caused the Petitioner to feel unloved. Ms. Rooks explained that she did not allow her children's friends to come over to their home and that her children had to be home before dark. Ms. Rooks stated that the Petitioner was a "good child" but that he "ran with the wrong crowd after [Ms. Rooks] cut [him] a little slack." Around the age of thirteen or fourteen, the Petitioner dropped out of school, but Ms. Rooks was not aware that the Petitioner had dropped out until the school called. Ms. Rooks tried unsuccessfully to get the Petitioner to go back to school.

Ms. Rooks reported that the Petitioner stayed in the hospital for one to two weeks after his suicide attempt. However, between his suicide attempt and the commission of the offense, the Petitioner did not receive any psychological counseling or treatment. She said she did not discuss the suicide attempt with the Petitioner after it happened because it was too painful. Mr. Rooks recalled that the Petitioner stopped "running with the wrong people" for about a month after his suicide attempt but then "he was right back doing the same thing." Ms. Rooks knew the Petitioner smoked marijuana, but she did not know of any of his other activities when he was with the "wrong people."

On cross-examination, Ms. Rooks said that she testified at the sentencing hearing about the Petitioner's suicide attempt. Ms. Rooks also stated that she met with trial counsel many times and that trial counsel discussed the strength of the State's case with her and informed her that the Petitioner could face a life sentence if he was convicted at trial. Ms. Rooks also talked to the Petitioner on the phone after the mistrial but before he pleaded guilty, and she thought the Petitioner understood what he was facing.

Trial counsel testified that she began representing the Petitioner after he was indicted. She said she went over the charges and reviewed discovery with the Petitioner. Trial counsel commented that, because the first trial ended in a mistrial, the Petitioner had heard a lot of the testimony that would be presented against him in a second trial. Before the second trial was scheduled to begin, trial counsel met with the Petitioner to discuss potential plea negotiations, but she could not remember their specific discussions. Trial counsel also met separately with Ms. Rooks to discuss the likelihood that the Petitioner would be convicted at trial. Shortly before the second trial was scheduled to begin, trial counsel learned that the State intended to call the Petitioner's co-defendant as a witness at trial. Trial counsel discussed this new information with the Petitioner. She also stated that, based on her experience, she thought that the State's plea offer of second degree murder was "not unreasonable" and communicated that information to the Petitioner. Trial counsel stated that she "strongly encouraged" the Petitioner to take the plea but that the decision to accept the guilty plea was the Petitioner's. Also, on the day of the plea hearing, trial counsel went over the plea petition with the Petitioner and explained that the Petitioner had the right to refuse the plea and proceed to trial. Trial counsel confirmed that there was nothing about her interactions with the Petitioner that would suggest that he did not understand what he was doing by pleading guilty.

On cross-examination, trial counsel stated that she was aware of the Petitioner's previous suicide attempt. She also confirmed that she did not have the Petitioner evaluated by a psychologist or psychiatrist prior to the sentencing hearing. However, trial counsel did introduce the Petitioner's medical records for the purpose of mitigation.

In a written order, the post-conviction court found that trial counsel presented the Petitioner's medical records and the testimony of Ms. Rooks for consideration during sentencing. The post-conviction court also found that the Petitioner had failed to establish that he was prejudiced by trial counsel's allegedly deficient conduct. Additionally, the post-conviction court found that the Petitioner's claim that the trial court improperly weighed a mitigating factor during sentencing was not a proper claim for post-conviction relief. However, the post-conviction court made no factual findings as to whether the Petitioner's plea was knowing and voluntary. Instead, the post-conviction court concluded, "[T]he Petitioner has failed to demonstrate by clear and convincing evidence . . . that the plea was a violation of due process rights in violation of a constitutional right to render his conviction and sentence void or voidable under the Post-Conviction Relief Act." This timely appeal followed.

## II. Analysis

On appeal, the Petitioner argues that trial counsel was ineffective for failing to present expert testimony regarding the Petitioner's mental health at the sentencing hearing. Additionally, the Petitioner contends that the post-conviction court erred when it

failed to weigh the factors outlined in Blankenship v. State, 858 S.W.2d 897 (Tenn. 1993), to evaluate the voluntarily and intelligent nature of the Petitioner's plea. Further, the Petitioner asserts that his plea was involuntary and unknowing.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

*Ineffective Assistance of Counsel*

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for a court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

When a petitioner claims that trial counsel was ineffective for failing to discover, interview, or present a witness in support of the petitioner's defense, such witness should be presented at the post-conviction hearing. State v. Black, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). As this court has previously stated:

> As a general rule, this is the only way the petitioner can establish that (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner. It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel.

Id.

In this case, the Petitioner contends that trial counsel was ineffective for failing to present expert testimony about the Petitioner's mental health at the sentencing hearing. However, the Petitioner failed to present any such expert testimony at the post-conviction hearing. Neither the post-conviction court nor this court may speculate as to what the testimony may have been or whether it would have been favorable to the Petitioner. See id. at 757. Accordingly, the Petitioner has failed to prove that he was prejudiced by trial counsel's alleged deficiency and is not entitled to relief on this issue.

*Involuntary and Unknowing Plea*

When reviewing a guilty plea, this court looks to both the federal standard as announced in the landmark case Boykin v. Alabama, 395 U.S. 238 (1969), and the state standard as announced in State v. Mackey, 553 S.W.2d 337 (Tenn. 1977), superseded on other grounds by Tenn. R. Crim. P. 37(b) and Tenn. R. App. P. 3(b). Don Allen Rodgers v. State, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *5 (Tenn. Crim. App. Apr. 26, 2012). Under the federal standard, there must be an affirmative showing that the plea was "intelligent and voluntary." Boykin, 395 U.S. at 242. Likewise, the Tennessee Supreme Court has held that "the record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e. that he has been made aware of the significant consequences of such a plea . . . ." Mackey, 553 S.W.2d at 340. "[A] plea is not 'voluntary' if it is the product of '[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats . . . ." Blankenship, 858 S.W.2d at 904 (quoting Boykin, 395 U.S. at 242-43).

In order to determine whether a plea is intelligent and voluntary, the trial court must "canvass[] the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." Boykin, 395 U.S. at 244. The trial court looks to several factors before accepting a plea, including:

> [T]he relative intelligence of the defendant; degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship, 858 S.W.2d at 904; see Howell v. State, 185 S.W.3d 319, 330-31 (Tenn. 2006). Once the trial court has conducted a proper plea colloquy, it discharges its duty to assess the voluntary and intelligent nature of the plea and creates an adequate record for any subsequent review. Boykin, 395 U.S. at 244.

Statements made by a petitioner, his attorney, and the prosecutor during the plea colloquy, as well as any findings made by the trial court in accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings." Blackledge v. Allison, 431 U.S. 63, 73-74 (1977). Statements made in open court carry a strong presumption of truth, and to overcome such presumption, a petitioner must present more than "conculsory allegations unsupported by specifics." Id. at 74.

- 9 -

Initially, we must address the Petitioner's contention that the post-conviction court erred when it failed to weigh the <u>Blankenship</u> factors to determine whether the Petitioner's plea was voluntary and intelligent. We note that the trial court did not make any oral or written findings of fact or conclusions of law about this claim but only made one conclusory statement that the Petitioner's constitutional rights were not violated by his plea. Tennessee Code Annotated section 40-30-111(b) states, "Upon the final disposition of every petition, the court shall enter a final order, and except where proceedings for delayed appeal are allowed, shall set forth in the order or a written memorandum of the case all grounds presented, and shall state the findings of fact and conclusions of law with regard to each ground." Failure to make such findings in this case was error. However, this requirement is to aid appellate review, and failure to meet the requirements of Tennessee Code Annotated section 40-30-111(b) is harmless when the record is "sufficient to effectuate meaningful appellate review." <u>George Scott Mason v. State</u>, No. M2013-01170-CCA-R3-PC, 2014 WL 1657681, at *4 (Tenn. Crim. App. Apr. 23, 2014), <u>perm. app. denied</u> (Tenn. Sept. 22, 2014); <u>see also</u> <u>Webb v. State</u> 475 S.W.2d 228, 236 (Tenn. Crim. App. 1971). Because the witnesses' testimony on the issue of the voluntary and intelligent nature of the Petitioner's plea was clearly set out at the post-conviction hearing and in the plea colloquy, it is not necessary for us to reverse the judgment of the post-conviction court. <u>See</u> <u>Jerome Sawyer v. State</u>, No. W2005-01813-CCA-R3-PC, 2007 WL 778828, at *15 (Tenn. Crim. App. Mar. 15, 2007), <u>perm. app. denied</u> (Tenn. Aug. 13, 2007) (citing <u>Webb</u>, 475 S.W.2d at 236). However, we urge upon the post-conviction court the importance of our having findings of fact and conclusions of law in the record in order to facilitate appellate review.

In this case, the Petitioner and his mother testified that he dropped out of school around the ninth grade. Additionally, trial counsel testified that she strongly encouraged the Petitioner to take the plea. The Petitioner stated that he spoke with his mother and trial counsel about taking the plea but denied that they forced him to accept the guilty plea. The Petitioner confirmed that he met with trial counsel many times and that she discussed the strength of the State's case with the Petitioner. The Petitioner stated that he understood he could have received a sentence of fifty-one years if he had been convicted of first degree murder after trial. He also understood that the maximum sentence he could have received for his guilty plea was twenty-five years. It is well-settled law that the inducement to plead guilty in exchange for a more lenient or shorter sentence does not constitute grounds for invalidating the plea. <u>See</u> <u>Blankenship</u>, 858 S.W.2d at 904; <u>George v. State</u>, 533 S.W.2d 322, 326 (Tenn. Crim. App. 1975). The Petitioner also confirmed that he understood that he was pleading guilty and that he decided to plead guilty on his own accord. The transcript of the plea hearing shows that the trial court conducted an appropriate <u>Boykin</u> plea colloquy, informing the Petitioner of his rights, and the Petitioner stated that he understood he was waiving those rights by entering a guilty plea. Based on the record before us, the Petitioner failed to prove by clear and

- 10 -

convincing evidence that his plea was unknowingly and involuntarily entered.  He is not entitled to relief.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____

ROBERT L. HOLLOWAY, JR., JUDGE